**UNITED STATES of America, Plaintiff,**

v.

**Benjamin SALLEE, Defendant.**

**No. 84 Cr. 177 (RO).**

United States District Court,
S.D. New York.

March 8, 1985.

Rudolph W. Giuliani, U.S. Atty., New York City (David Hammer, Asst. U.S. Atty., New York City, of counsel), for plaintiff.

Benjamin Sallee, defendant, pro se.

OPINION AND ORDER

OWEN, District Judge.

Defendant Benjamin Sallee was indicted—and convicted—for two sales of heroin in bulk. His dealings, unfortunately for him, were with undercover agents of the United States Drug Enforcement Administration. It appears from early colloquy in the case that his initial plan was to defend on the ground of entrapment.[1]

On the morning his trial was originally scheduled, with the jury panel and government witnesses waiting, Mr. Sallee arrived late and, to everyone's surprise, fired his retained lawyer, allegedly for revealing secrets to the prosecution. Sallee thereafter endeavored to use his lack of counsel and an asserted lack of funds[2] to obtain an extensive postponement—up to a year. When this was met by the Court's appointment of a Federal Defender, Sallee fired that lawyer, too, claiming that a lawyer paid under the federally-funded Criminal Justice Act had a conflict of interest in representing him against that same Federal government—a man cannot "serve two

---

1. This was told to Judge Palmieri by Sallee's first lawyer the day the trial originally was scheduled to start.

2. I observe that notwithstanding Mr. Sallee's protestations of indigency, he hired an electronics expert during trial, and retained a new lawyer for sentencing.

masters," he said.[3] He took this step knowing that by this conduct he would have to proceed *pro se.*

The trial started approximately one month later.[4] Mr. Sallee's opening statement to the jury outlined the anticipated entrapment defense, but with a significant addition. It went as follows:

MR. SALLEE: So Buddy approached me [in August of 1982]. He said, "I have a supplier. The only thing you have to do is stand good for me for the money part."

So I said, "Okay." I said, "Stand good for you for the money." I said, "Buddy, I don't care what, I'm not touching it. You do what you want to do." He said, "Okay." He said, "All you have to do, pick it up, bring it to my house." I said, "Buddy, you pick it up. You go to the guy. You go sit down and talk to the guy." Me and Buddy, we sit down and you talk to the guy.

The people, they know my reputation in the streets, because they know if I stand good for something I would pay it. I have been in the number business since '63. There is no one in Jamaica, New York City, Long Island, or anywhere that would say I owe them for a number or anything as far as money is concerned. You see, I have a reputation up in the streets at which I would say I was born with it, or I just lived up to it. So Buddy introduced me to these people where I got the drugs from.

So after Buddy introduced me, he asked me—he asked me, whatever the price was, so and so and so and so, and I said I would stand good for it.

Okay, I come back down. I'm going to get down to the conversation where the prosecutor already mentioned about the drugs. I talked to his agent on the phone. That was in 1982. Somehow, with the guy that wanted the money that I had to stand good for, and where the agent wanted to buy it for, we could never come to terms. So I passed.

So the next time it was in, I would say, Thanksgiving of 1983. It could have been a week before Thanksgiving of '83. Buddy approached me again and asked me to get him some drugs. So this time, as I said before, I was a Born Again Christian. This time I took it to the Lord. I sat down and I asked the Lord, what shall I do. Buddy, He tells me, He says, Buddy is the police, He says, Those are the police that you are dealing with. He tells me, what they want, give it to them anyhow.

So, that came to me in a dream one night. Going back to Buddy, He tells Buddy okay.

Now, the first meeting that we have, Buddy, myself and Jefferies, I believe was the name that he was using—Jefferies. I told him almost the same thing as—I told him—Jefferies asked a question or whatever; I can't remember right now, but it will come up later. And then at no time—I want you to keep this in mind—at no time did they find drugs on me or if I touched the drugs. At no time.

When we picked up the drugs, I had someone else pick the drugs up for me. They was with me, I was with them. I would come to, as they say, Buddy's house. The friend I had picked picked the drugs up and would give it to Buddy. Buddy would take the drugs from his house to Pennsylvania Station. The only thing I'm doing there was making sure the man that paid out the drugs get paid the money he was supposed to get.

Mr. Sallee thereafter attempted to show entrapment through a lengthy cross-examination of the government informant, Free-

---

**3.** *Matthew* 6:24.

**4.** At the opening of the trial before me, Mr. Sallee, without any prior notice, asked for a postponement saying he was speaking to a lawyer that night. He was told that the trial would proceed but that the lawyer could join it at any time. On the second day of the trial, and in the presence of the jury, he demanded that the trial be adjourned to give him time to get a lawyer. The jury was thereafter informed that Mr. Sallee had previously fired his lawyer, and was exercising his right to self-representation.

man Mitchell—the "Buddy" of his opening. While successfully establishing Mitchell's unsavory background and extensive history as a paid government informant, Sallee was less successful in setting forth a credible picture of entrapment, notwithstanding extensive use of leading questions.

He also sought a delay of the trial, claiming that the government had altered the tapes of phone calls memorializing his agreement to sell a kilogram of heroin to the undercover agents. He said they had deleted all the times he claims to have said, "I know you're the police." While I declined to delay the trial, it appeared that Mr. Sallee—notwithstanding his claimed indigence—had hired an electronics expert, and I had the expert given the tapes to examine for tampering. The expert represented to me that he would report back the next morning. He, however, was never heard from again.

To support his new exculpatory theory that he had been acting in accord with divine guidance, Mr. Sallee took the stand himself and announced that he was first going to read to the jury from the whole book of Genesis and thereafter to "walk through the Bible, go through the Bible and explain certain things that is in the Bible that is happening today." When I declined to permit this and directed him to proceed to relevant matters, he chose not to give any testimony at all.[5]

Finally, prior to the summations, Mr. Sallee was instructed in the robing room that he was to argue to the jury only from matters in the record and was not to add any new material in the course of his argument. He then spoke to me as follows:

MR. SALLEE: Even though Mr. Hammer also knows that I took the lie detector test, and he also knows the results of that.

THE COURT: Well, that is not in the record and there is to be no reference to

a lie detector test. That is not to be referred to in the course of this argument.

Do you understand that?

MR. SALLEE: Yes, in a way.

THE COURT: There is to be no qualification on it. That is not in the record, and therefore there is to be no reference to a lie detector test in your closing argument to the jury. That is a court direction.

His summation, however, quickly reached the following:

MR. SALLEE: I also took a lie detector test and passed that.

MR. HAMMER: Objection.

THE COURT: Mr. Sallee, we discussed this. You are not to refer to that in any way, shape or form. That is an order of the Court.

MR. SALLEE: Yes, sir.

THE COURT: Go onto some other subject.

MR. SALLEE: I understand that. As I said, I passed a lie detector test.

THE COURT: Now, the jury will disregard this, and I will make some observations about it later.

You go onto another subject, sir, or your argument is terminated.

The jury will disregard that remark.

MR. SALLEE: As I said before, it showed that I have not been involved in drugs. Mr. Hammer knows it—

MR. HAMMER: Objection.

THE COURT: Sir, you are to sit down. Mr. Sallee, you are to sit down.

The jury was excused, and in their absence Mr. Sallee was found in contempt of court for violation of the Court's express order and was sentenced to three months to commence immediately. He was informed that the sentence would be independent of the outcome of the trial. This was to keep him

---

**5.** I note that Sallee's position, that the Lord told him to sell heroin to the police, was never mentioned by retained counsel at the first aborted trial, nor was Sallee's mental competence ever raised by Sallee's counsel at any time prior to sentencing, when the matter was at most

"suggested" by his new counsel retained for sentencing. I can only conclude that the alleged "Lord's command" was the fabrication of a street-smart gambler turned drug-dealer, who was seeking to avoid the clear consequences of having been caught "red-handed."

from further arguing prohibited matters to the jury. Upon the jury's return, Mr. Sallee declined to proceed to any other subject, and his summation was declared terminated. It appears that Mr. Sallee had no interest in arguing other than prohibited matters.

The foregoing constitutes the Court's findings and conclusions in the matter of the imposition of a three months period of imprisonment for contempt imposed on November 29, 1984, and is so ordered.